[No. B085773. Second Dist., Div. One. May 3, 1996.]

ALAN D. SODERBERG, as Trustee, etc., et al., Plaintiffs and Appellants,
v.
GARY McKINNEY, Defendant and Respondent.

**COUNSEL**

Thomas B. McCullough, Jr., and Lauriann C. Wright for Plaintiffs and Appellants.

Callahan, McCune & Willis, Edward L. Schumann and John J. Tasker for Defendant and Respondent.

## OPINION

**MASTERSON, J.**—In *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745], the Supreme Court held that an auditor may be liable to a third party—someone other than a client—who relies on an audit report containing negligent misrepresentations, provided the auditor intended that the third party use the report. In this case, we address whether such liability extends to a real estate appraiser who, although retained by a mortgage broker, knows that his report will be used by potential investors in the brokered loan. We hold that it does.

### BACKGROUND

For several years, Alan Soderberg, in his capacity as the trustee for A.D.S. Planning, Inc., Profit Sharing Plan Trust (the Trust), has invested pension money in loans secured by first and second deeds of trust. The Trust employs certain criteria in deciding whether to purchase a particular trust deed. The main factor is loan-to-value ratio, i.e., the difference between the total outstanding loans and the appraised value of the property. If a loan under consideration (together with any existing loans) exceeds 70 percent of the property's value, the Trust will not make the investment. The value of the property is established by a licensed appraiser.

In 1990, National Home Loans, Inc. (Home Loans), a mortgage broker, contacted Soderberg about investing $75,000 in a second deed of trust on residential property located in Redondo Beach, California. He was told that the appraised value of the property was $670,000 and that the balance due on the first deed of trust was $341,000. Because this information met the Trust's criteria for making a loan, Soderberg verbally committed to invest $50,000 pending receipt of the pertinent documents, including the appraisal report.

After receiving the appraisal, prepared by Gary McKinney, a certified real estate appraiser, Soderberg confirmed that McKinney had valued the property at $670,000. Relying on that figure, Soderberg sent Home Loans a check for $50,000. He also contacted Roosevelt and Leola Ragland about this investment, and they contributed the remaining $25,000 of the loan. In exchange for these funds, Soderberg received a second trust deed.

The borrowers defaulted on both the first and the second deeds of trust. Soderberg then learned for the first time that the true value of the property

was between $450,000 and $500,000, leaving virtually no equity to protect the Trust's and the Raglands' investments. As a result, the Trust foreclosed on the second deed of trust, reinstated the first trust deed, and made monthly payments on the first trust deed. However, the Trust eventually stopped making those payments, and the holder of the first trust deed foreclosed on the property. Neither the Trust nor the Raglands would have invested in the loan had they known the true value of the property.

In July 1991, the Trust and the Raglands filed this action against McKinney and Home Loans, alleging causes of action for fraud, negligent misrepresentation, suppression of fact, and breach of contract.[1] In October 1993, McKinney moved for summary judgment or, in the alternative, for summary adjudication on each cause of action. As to the negligent misrepresentation claim, McKinney argued that he owed no duty to plaintiffs.[2] On the contract claim, he asserted that there was no contract between plaintiffs and himself. The trial court (Commissioner Bruce Mitchell, presiding) granted summary adjudication on the claims for negligent misrepresentation and breach of contract but denied the motion as to the other claims.

Thereafter, plaintiffs dismissed the remaining causes of action (for fraud and suppression of fact) without prejudice as to McKinney only.[3] Home Loans agreed to pay plaintiffs $250,000, and plaintiffs, in turn, agreed to the entry of judgment. In June 1994, the trial court (Judge William Beverly, presiding) entered judgment decreeing that plaintiffs recover $250,000 from Home Loans and that judgment be entered against plaintiffs as to McKinney. Plaintiffs filed a timely appeal from the judgment, challenging the trial court's summary adjudication ruling in McKinney's favor.

## DISCUSSION

In reviewing a summary adjudication ruling, the moving party's evidence is strictly construed while that of the opposing party is liberally construed. (*Hanooka* v. *Pivko* (1994) 22 Cal.App.4th 1553, 1558 [28 Cal.Rptr.2d 70].) We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. (*Kelleher* v. *Empresa Hondurena de Vapores, S.A.* (1976) 57 Cal.App.3d 52, 56 [129 Cal.Rptr. 32].) In other words, the facts alleged in the evidence of the party opposing summary adjudication must be accepted as true. (*Zeilman* v. *County of Kern* (1985) 168 Cal.App.3d 1174, 1179, fn. 3 [214 Cal.Rptr. 746].)

---

[1] McKinney and Home Loans filed cross-complaints against each other seeking indemnification and contribution.

[2] We occasionally refer to the Trust and the Raglands collectively as "plaintiffs."

[3] McKinney and Home Loans dismissed their respective cross-complaints without prejudice.

Summary adjudication is appropriate if all the papers submitted show that a cause of action lacks merit as a matter of law. (Code Civ. Proc., § 437c, subd. (f).) "A defendant seeking summary [adjudication] has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary [adjudication], the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact." (*Hanooka* v. *Pivko*, *supra*, 22 Cal.App.4th at p. 1558, citations omitted; see also Code Civ. Proc., § 437c, subd. (o)(2).) We construe the evidence most favorably to the party opposing summary adjudication and resolve any doubts against the granting of the motion. (*Jackson* v. *Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1835-1837 [20 Cal.Rptr.2d 913].)[4]

## A. *Negligent Misrepresentation Claim*

In their complaint, plaintiffs alleged that McKinney negligently misrepresented the value of the property, that he had no reasonable grounds for believing the stated valued to be correct, that he prepared the appraisal report with the intent to induce plaintiffs to invest in the second trust deed, and that they relied on his appraisal to their detriment.

Plaintiffs contend that *Bily* v. *Arthur Young & Co.*, *supra*, 3 Cal.4th 370 (hereafter *Bily*) precluded summary adjudication of their negligent misrepresentation claim. In *Bily*, the Supreme Court addressed the question of "whether and to what extent an accountant's duty of care in the preparation of an independent audit of a client's financial statements extends to persons other than the client." (*Id.* at p. 375.) There, a company's auditor had issued an unqualified or "clean" audit opinion on the company's financial statements. In reliance on the auditor's opinion, several third parties invested in the company. The investments went sour, and the investors sued the auditor

---

[4]We reject plaintiffs' contention that the summary adjudication motion was filed too late. According to plaintiffs, the trial was initially set to begin on June 7, 1993, but it was continued several times, eventually to February 28, 1994. They contend that any summary judgment or summary adjudication motion had to be filed before the *first* trial date. (The motion was actually filed on October 8, 1993, when the trial had been rescheduled for December 6, 1993.) This contention is without merit. (*Green* v. *Bristol Myers Co.* (1988) 206 Cal.App.3d 604, 608-610 [253 Cal.Rptr. 745] [trial court may properly hear summary judgment motion 30 days before continued trial date].) Plaintiffs' other procedural challenges to the motion (e.g., untimely notice) were not raised in the trial court and thus were waived. Accordingly, we do not consider them. (*Santantonio* v. *Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113 [30 Cal.Rptr.2d 486].)

for negligence, negligent misrepresentation, and fraud. A jury found for the investors on the general negligence claim only, and the Court of Appeal affirmed that portion of the verdict.

The Supreme Court reversed, holding that "an auditor's liability for general negligence in the conduct of an audit of its [client's] financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory." (*Bily, supra,* 3 Cal.4th at p. 406.) However, the court approved a negligent misrepresentation claim by third parties, stating: "There is, however, a further narrow class of persons who, although not clients, may reasonably come to receive and rely on an audit report and whose existence constitutes a risk of audit reporting that may fairly be imposed on the auditor. Such persons are specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report. While such persons may not recover on a general negligence theory, we hold they may . . . recover on a theory of negligent misrepresentation." (*Id.* at pp. 406-407.)

With respect to negligent misrepresentation claims, the court adopted the analysis of the Restatement Second of Torts, explaining as follows: "Section 552 of the Restatement Second of Torts covers 'Information Negligently Supplied for the Guidance of Others.' It states a general principle that one who negligently supplies false information 'for the guidance of others in their business transactions' is liable for economic loss suffered by the recipients in justifiable reliance on the information. ([Rest.2d Torts, § 552], subd. (1).) But the liability created by the general principle is expressly limited to loss suffered: '(a) [B]y the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.' (*Id.,* subd. (2).) To paraphrase, a supplier of information is liable for negligence to a third party only if *he or she intends to supply the information for the benefit of one or more third parties in a specific transaction or type of transaction identified to the supplier.*" (*Bily, supra,* 3 Cal.4th at p. 392, italics added.)

The court continued: "The authors of the Restatement Second of Torts offer several variations on the problem before us as illustrations of section 552. For example, the auditor may be held liable to a third party lender if the auditor is informed by the client that the audit will be used to obtain a $50,000 loan, *even if the specific lender remains unnamed or the client names one lender and then borrows from another.*" (*Bily, supra,* 3 Cal.4th at p. 393, citing Rest.2d Torts, § 552, com. h, illus. 6, 7, italics added.)

In this case, plaintiffs rely on *Bily* for the proposition that McKinney owed them a duty of care because he knew that Home Loans would give potential third party investors a copy of his appraisal report. It was not necessary, plaintiffs contend, that McKinney know the names or identities of the particular investors. Plaintiffs further argue that the duty of care recognized in *Bily* is not limited to auditors but applies equally to other types of professionals (including real estate appraisers) who knowingly supply information for the use of third parties.

For his part, McKinney argues that *Christiansen* v. *Roddy* (1986) 186 Cal.App.3d 780 [231 Cal.Rptr. 72] is controlling. In *Christiansen*, a mortgage broker was contacted by a borrower, who wanted to obtain a loan using real property as collateral. The broker hired a real estate appraiser to value the property. The appraiser prepared a report, and the broker included the appraiser's evaluation in a loan brochure given to potential investors. Several individuals read the brochure and invested in the loan. The borrower defaulted and deeded the property to the investors, who put the property up for sale. No one purchased the property. The investors sued the appraiser for damages, alleging that he had negligently misrepresented (overstated) the property's value.

The trial court found for the investors. The Court of Appeal reversed, concluding that the appraiser had performed services for the broker and the borrower, not the investors. (186 Cal.App.3d at p. 787.) Because the appraiser did not know that any of the investors were considering making the loan, he "could not have intended that [they] rely on his appraisal." (*Ibid.*) In reaching this result, the court stated: " ' "When the representation is made directly to the plaintiff [i.e., investor], in the course of his dealings with the defendant [i.e., appraiser], or is shown to him with knowledge that he intends to rely upon it, there has been no difficulty in discovering a duty of reasonable care; and the same duty has been found where it is made to a third person with knowledge that he intends to communicate it to the *specific individual plaintiff* for the purpose of inducing him to act. At this point most of the courts have drawn the line, holding that mere reasonable anticipation that the statement will be communicated to others, or even knowledge that the recipient intends to make a commercial use of it in dealing with *unspecified strangers*, is not sufficient to create a duty of care toward them." ' " (*Id.* at p. 786, italics added, quoting *Hawkins* v. *Oakland Title Ins. & Guar. Co.* (1958) 165 Cal.App.2d 116, 129 [331 P.2d 742].)

█ McKinney contends that under *Christiansen* he owed no duty to plaintiffs as a matter of law since he did not know their names or specific identities until after they had relied on his report and invested in the loan.

Plaintiffs counter that *Christiansen* has been overruled by *Bily*. The trial court agreed with McKinney, stating: "One can infer that Mr. McKinney knew that his appraisal was for the purpose of testing the equity for a potential loan, in view of the nature of the assignment and his having done approximately 200 appraisals for the broker. . . . [¶] . . . [¶] [However], there is no evidence that the defendant appraiser was advised of any *particular* lender, any *particular* transaction, or any *particular* amount . . . ." (Italics added.)

We conclude that *Bily* compels the reversal of summary adjudication on the negligent misrepresentation claim. For several reasons, we disagree with the trial court's analysis and, in the process, conclude that certain principles announced in *Christiansen* are no longer valid in light of *Bily*.

As a preliminary matter, we reject McKinney's contention that *Bily* does not apply to real estate appraisers. While *Bily* involved the liability of accountants (or auditors), we see no reason why its discussion should be limited to that group of professionals. ■ As the high court pointed out, "Accountants are not unique in their position as suppliers of information and evaluations for the use and benefit of others. Other professionals, including attorneys, architects, engineers, title insurers and abstractors, and others also perform that function. And, like auditors, these professionals may also face suits by third persons claiming reliance on information and opinions generated in a professional capacity." (*Bily*, *supra*, 3 Cal.4th at p. 410.) Other courts have expressly extended such liability to real estate appraisers. (See, e.g., *Stotlar* v. *Hester* (1978) 92 N.M. 26 [582 P.2d 403], cert. den. 92 N.M. 180 [585 P.2d 324]; *Chemical Bank* v. *National Union Fire Ins.* (1980) 74 A.D.2d 786 [425 N.Y.S.2d 818], app. dism. 53 N.Y.2d 864 [440 N.Y.S.2d 187, 422 N.E.2d 832]; *Perpetual Fed. S. & L.* v. *Porter & Peck* (1992) 80 Ohio.App.3d 569 [609 N.E.2d 1324]; see also *Lincoln Alameda Creek* v. *Cooper Industries, Inc.* (N.D.Cal. 1992) 829 F.Supp. 325, 328 [stating that *Bily* covers "all groups of information-supplying professionals"].) *Bily* therefore applies to real estate appraisers.

■ Further, we do not believe that a real estate appraiser hired by a mortgage broker must know the potential investors by name or specific identity. As *Bily* indicated, liability may be appropriate where the defendant "knows with substantial certainty that plaintiff, *or the particular class of persons to which plaintiff belongs*, will rely on the representation in the course of the transaction." (3 Cal.4th at p. 414.) The Restatement Second of Torts elaborates on this point: "[I]t is not necessary that the [supplier of information] should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not

required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given." (Rest.2d Torts, § 552, com. h, pp. 132-133.)

 Nor does the appraiser have to contemplate the precise details of the transaction in which his report is ultimately used. Liability may exist if his report is relied upon in the *type* of transaction he anticipated or in one substantially similar to it. (*Bily, supra*, 3 Cal.4th at pp. 392, 410.) According to the Restatement: "[T]he liability of the maker of a negligent misrepresentation is limited to the transaction that he intends, or knows that the recipient intends, to influence, or to a substantially similar transaction. [¶] . . . [I]t is not necessary that the transaction in which the opinion is relied on shall be identical in all of its minute details with the one intended. It is enough that it is substantially the same transaction or one substantially similar. . . . [¶] There may be many minor differences that do not affect the essential character of the transaction. The question may be one of the extent of the departure that the maker of the representation understands is to be expected." (Rest.2d Torts, § 552, com. j, p. 137.)

Finally, if the size of the investment made in reliance on the appraiser's report is materially greater than what the appraiser expected, the increased risk of liability to him may preclude a duty of care to third persons. As the Restatement explains: "If [the appraiser] is told that the information that he supplies is to be used in applying to a particular bank for a loan of $10,000, the fact that the loan is made by that bank for $15,000 will not necessarily mean that the transaction is a different one. But if the loan is for $500,000, the very difference in amount would lead the ordinary borrower or lender to regard it as a different kind of transaction. The ordinary practices and attitudes of the business world are to be taken into account, and the question becomes one of whether the departure from the contemplated transaction is so major and so significant that it cannot be regarded as essentially the same transaction." (Rest.2d Torts, § 552, com. j, pp. 137-138.)

 Applying *Bily* and the principles set forth in the Restatement, we find no fault with the result in *Christiansen*. There was no evidence in that case that the appraiser knew his report would be used by third party investors. Indeed, it appears that the appraiser may not have known what purpose his appraisal was intended to serve. It is not surprising, then, that *Bily* cites *Christiansen* with approval for the proposition that liability "is restricted to those to whom or for whom the misrepresentations were made." (*Bily, supra,* 3 Cal.4th at p. 408.) Thus, we agree with *Christiansen's* conclusion that the appraiser there was not liable to the investors, given that he "could not have intended that [they] rely on his appraisal." (*Christiansen* v. *Roddy, supra,* 186 Cal.App.3d at p. 787.)

At the same time, we question certain language in *Christiansen*. In particular, the court stated that, as a prerequisite to liability, an appraiser must know the "specific individual" investor. (186 Cal.App.3d at p. 786, quoting *Hawkins* v. *Oakland Title Ins. & Guar. Co., supra,* 165 Cal.App.2d at p. 129.) The court also remarked that liability is barred as to "unspecified strangers." (*Ibid.*) We believe that this language is inconsistent with statements in *Bily* and the Restatement that a professional supplier of information need not know the third party's name or specific identity; it is sufficient that the third party belongs to a particular group or class which the information was intended to benefit. (*Bily, supra,* 3 Cal.4th at pp. 392, 393; Rest.2d Torts, § 552, com. h, pp. 132-133.) Accordingly, contrary language in *Christiansen* is no longer good law.[5]

With these principles in mind, we turn to the evidence before the trial court on McKinney's summary adjudication motion. In support of his motion, McKinney filed a declaration stating that he did not know that the appraisal would be communicated to or relied upon by anyone other than Home Loans. Further, the appraisal report itself stated that it was intended to assist Home Loans in its real estate lending decisionmaking and that "[r]eproduction of this appraisal report is restricted to such use by [Home Loans]."

---

[5] McKinney's reliance on *Nymark* v. *Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089 [283 Cal.Rptr. 53] is also misplaced. That case involved an attempt by a *borrower* to impose liability on a *lender* for the alleged misrepresentations of a real estate appraiser retained by the lender. The appraisal had been performed solely to assist the lender in deciding whether to make the loan. There was no evidence that the appraisal was intended to benefit the borrower. Similarly, McKinney's other cases are inapposite. (See *Gay* v. *Broder* (1980) 109 Cal.App.3d 66 [167 Cal.Rptr. 123] [potential borrower had no claim against real estate appraiser where sole purpose of appraisal was to assist lender in deciding whether to make loan]; *Industrial Indemnity Co.* v. *Touche Ross & Co.* (1993) 13 Cal.App.4th 1086 [17 Cal.Rptr.2d 29] [borrower's auditor not liable to lender's surety where audit report not intended for use in obtaining line of credit from lender].)

In opposing summary adjudication, plaintiffs submitted evidence to the effect that (1) McKinney had performed approximately 200 appraisals for Home Loans, (2) Home Loans had always sent a copy of McKinney's reports to potential investors, (3) on occasion, Home Loans had contacted McKinney with inquiries from investors about his reports, and (4) plaintiffs had relied on McKinney's report in making the investment at issue. In addition, plaintiffs offered expert testimony that an appraiser who provides reports to a mortgage broker "knows [that] someone other than the loan broker is really the one taking the risk and relying upon that report" and that a potential investor (either an institution or an individual) is always involved.[6] Significantly, this view of the evidence is supported by McKinney's own brief, in which he describes the mortgage brokerage business as follows: "The procedure for making this type of loan involves a broker such as [Home Loans] who attempts to connect person[s] interested in borrowing money using real property as security, with investors who have cash readily available. . . . In the present case, [Home Loans] packaged the subject loan . . . . As part of its marketing procedure, [Home Loans] obtained an appraisal by [McKinney]."

Based on this record, McKinney did not establish as a matter of law that he believed the appraisal would be used solely by Home Loans. Rather, viewing the evidence most favorably to plaintiffs, McKinney knew that a particular group or class of persons to which plaintiffs belonged—potential investors contacted by Home Loans—would rely on his report in the course of a specific type of transaction he contemplated—investing in a deed of trust secured by the appraised property. (See *Stotlar* v. *Hester, supra,* 92 N.M. at pp. 27-29, 30-31 [582 P.2d at pp. 404-406, 407-408] [reversing summary judgment where evidence suggested that real estate appraiser knew his report would be used by prospective investors].) It does not matter that Home Loans (instead of McKinney) transmitted the appraisal report to plaintiffs. An appraiser may be liable if he knew that his client would forward the report to a particular class of persons. (See *Bily, supra,* 3 Cal.4th at pp. 392, 393, 414; Rest.2d Torts, § 552, com. h, p. 133.) Finally, McKinney offered no evidence that the amount of the loan was materially greater

---

[6]Plaintiffs' expert testified at his deposition as follows: "At the residential level, you're talking about a wholesale mortgage lending environment where reports are initiated at one place and are brokered here and brokered there and may go three or four places and the appraiser never knows who's going to use that report, but he knows someone other than the loan broker is really the one taking the risk and relying upon that report. The loan broker typically is only in it for a commission. [¶] I think it's reasonable to expect that appraisers who operate in that community understand that there is always an investor, whether it's institutional or whether it's private."

than what he expected.[7] In sum, disputed issues of material fact concerning the intended beneficiaries of the appraisal and the circumstances of the transaction precluded summary adjudication.

Thus, the trial court erred in granting summary adjudication in McKinney's favor on the negligent misrepresentation claim.[8]

## B. *Breach of Contract Claim*

██ In their cause of action for breach of contract, plaintiffs alleged that a contract existed between them and Home Loans concerning the making of a loan secured by a second deed of trust, that defendants (Home Loans and McKinney) breached the contract by overstating the value of the property used to secure the deed, and that said breach resulted in damage to plaintiffs.

In moving for summary adjudication, McKinney established that there was no contract between him and plaintiffs. He argued that he could not be liable for breach of contract because he was not a party to any agreement with plaintiffs. In response, plaintiffs claimed that they were third party beneficiaries of a contract between McKinney and Home Loans regarding his preparing appraisal reports for potential investors. In their opposition papers, plaintiffs requested leave to amend the breach of contract claim to allege this third party beneficiary theory. The trial court stated that it would not rule on plaintiffs' request to amend "because only summary adjudication is being granted, and not summary judgment." The court proceeded to grant summary adjudication in McKinney's favor on the breach of contract claim. In doing so, the court commented that *Bily, supra,* 3 Cal.4th 370, appeared to require an *express* designation of a third party beneficiary, such that plaintiffs' proposed theory would fail even if it had been alleged. We disagree with the trial court for two reasons.

First, the fact that the trial court was granting summary adjudication rather than summary judgment is beside the point. Even though the ruling on the

---

[7] In fact, McKinney does not devote any discussion on appeal to his expectations about the size of the loan. Given McKinney's silence on this subject, we cannot conclude that the actual transaction imposed a materially greater risk of liability than that which McKinney contemplated when he prepared and submitted the appraisal.

[8] Our analysis is based on the evidence that was before the trial court on the summary adjudication motion. We therefore express no view on the ultimate outcome of the case or any issue raised in the motion. Moreover, in concluding that McKinney was not entitled to summary adjudication, we do not suggest that plaintiffs would be entitled to prevail on such a motion. We simply find that disputed issues of material fact precluded a ruling in McKinney's favor as a matter of law.

summary adjudication motion did not dispose of plaintiffs' entire lawsuit, it certainly brought an end to the contract claim—the only claim plaintiffs sought to amend. The question of whether plaintiffs should have been allowed to amend the contract claim was not affected by the trial court's decision to deny summary adjudication on two *other* causes of action (for fraud and suppression of fact). In opposing a summary adjudication motion, a plaintiff may properly request leave to amend the complaint. (*Foxborough* v. *Van Atta* (1994) 26 Cal.App.4th 217, 230 [31 Cal.Rptr.2d 525].) The trial court should then exercise its discretion in deciding whether the amendment would be " 'in furtherance of justice.' " (*Ibid.*, quoting Code Civ. Proc., § 473.)

As one Court of Appeal has noted: " 'A motion for summary judgment may effectively operate as a motion for judgment on the pleadings.' . . . Where the complaint is challenged and the facts indicate that a plaintiff has a good cause of action which is imperfectly pleaded, the trial court should give the plaintiff an opportunity to amend." (*Kirby* v. *Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1067 [14 Cal.Rptr.2d 604], citation omitted; accord, *Williams* v. *Braslow* (1986) 179 Cal.App.3d 762, 774 [224 Cal.Rptr. 895].)

Second, we recognize that "if the proposed amendment fails to state a cause of action, it is proper to deny leave to amend." (*Foxborough* v. *Van Atta, supra,* 26 Cal.App.4th at p. 230.) However, that does not seem to be the situation here. "The prevailing American rule permits a third party beneficiary under a contract to enforce it. . . . The rule is codified in Civil Code section 1559, which provides: 'A contract, made expressly for the benefit of a third person, may be enforced by him [or her] at any time before the parties thereto rescind it.' The promise in such a situation is treated as having been made directly to the third party. . . . It is not necessary that an express beneficiary be specifically identified in the contract; he or she may enforce it if he or she is a member of a class for whose benefit the contract was created." (*Outdoor Services, Inc.* v. *Pabagold, Inc.* (1986) 185 Cal.App.3d 676, 681 [230 Cal.Rptr. 73], citations omitted, cited with approval in *Bily, supra,* 3 Cal.4th at p. 406, fn. 16.) The evidence submitted in opposition to McKinney's summary adjudication motion indicates that plaintiffs may be able to plead a viable third party beneficiary claim. (See *Stotlar* v. *Hester, supra,* 92 N.M. at pp. 29-31 [582 P.2d at pp. 406-408] [reversing summary judgment where lenders presented evidence that they were third party beneficiaries of agreement between appraiser and property owner].)

In closing, we note that in *Bily, supra,* 3 Cal.4th 370, the Supreme Court briefly discussed third party beneficiaries in the context of an auditor's

liability to third persons. (*Id.* at p. 406, fn. 16.) However, that discussion focused on whether auditors can be found liable to someone other than a client for general negligence. (*Id.* at pp. 404-406.) In holding that only a client can maintain a general negligence claim, the court made the following comments: "In theory, there is an additional class of persons who may be the practical and legal equivalent of 'clients.' It is possible that the audit engagement contract might *expressly identify* a particular third party or parties so as to make them *express* third party beneficiaries of the contract. . . . [W]e have no occasion to decide [in this case] whether and under what circumstances *express* third party beneficiaries of audit engagement contracts may recover as 'clients' under our holding." (*Id.* at p. 406, fn. 16, italics added.)

Plainly, the court referred to "express third party beneficiaries" in discussing the possibility that such beneficiaries might have a claim against an auditor under a general negligence theory. In other words, the court noted, but did not decide, that an expressly designated beneficiary might be permitted to pursue the same *general negligence* claim as the auditor's client. However, the court's discussion does not cast doubt on the applicability of traditional third party beneficiary principles to a *breach of contract* action. Under those principles, "the third person need not be named or identified individually to be an express beneficiary." (*Kaiser Engineers, Inc.* v. *Grinnell Fire Protection Systems Co.* (1985) 173 Cal.App.3d 1050, 1055 [219 Cal.Rptr. 626].) " 'All that [the law] requires is that the contract be "made expressly for the benefit of third parties," and "expressly" simply means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly." ' " (*Shepherd* v. *Miles & Sons, Inc.* (1970) 10 Cal.App.3d 7, 15 [89 Cal.Rptr. 23].) Thus, it is sufficient if the plaintiff belongs to a class for whose express benefit the contract was made. (*Kaiser Engineers, Inc.* v. *Grinnell Fire Protection Systems Co., supra*, 173 Cal.App.3d at p. 1055.)

Accordingly, we reverse the trial court's summary adjudication ruling as to the breach of contract claim. On remand, the trial court should rule on plaintiffs' request to amend the complaint so as to allege a third party beneficiary theory.

## DISPOSITION

The judgment is reversed insofar as the trial court granted McKinney's motion for summary adjudication as to the claims for negligent misrepresentation and breach of contract. The trial court is directed to reinstate the

negligent misrepresentation claim and to rule on plaintiffs' request that they be granted leave to amend the complaint to allege a third party beneficiary theory on the contract claim. In all other respects, the judgment is affirmed. Appellants are entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 14, 1996.